UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                   :

UNITED STATES OF AMERICA,                 :

                                                   :

               -v-                      :         95 Cr. 942 (JPC)
                                                   :        20 Civ. 9733 (JPC)

                                                   :

RONALD OCASIO,                         :        <u>OPINION AND ORDER</u>

                                                   :

                         Defendant.         :

                                                   :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Ronald Ocasio moves under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. In April 1997, following a ten-week trial, a jury convicted Ocasio of offenses for violating the Racketeering Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1961-1968, violating the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959, and committing firearms offenses in violation of 18 U.S.C. § 924(c). In July 1998, the Honorable Deborah A. Batts, to whom this case was then assigned, sentenced Ocasio to a term of life imprisonment and a consecutive forty-five-year term of imprisonment. In February 2008, Ocasio filed his first Section 2255 motion, which the Court denied. On November 4, 2020, the Second Circuit granted Ocasio leave to file a second Section 2255 motion, which is presently before this Court. In the instant motion, Ocasio argues that his Section 924(c) convictions must be vacated following the United States Supreme Court's decision in *United States v. Davis*, 588 U.S. 445 (2019), that the RICO and VICAR statutes are unconstitutionally vague, and that his convictions were obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). For the following reasons, the Court denies Ocasio's motion in its entirety.

## I.  Factual Background[1]

On October 27, 1995, an indictment was filed charging Ocasio and twenty-one co-defendants with various racketeering, narcotics distribution, and firearms crimes in connection with their operation of a violent enterprise known as the "Bryant Boys."  Dkt. 1; *see also Ocasio*, 2012 WL 3245419, at *1.  On April 7, 1997, following a ten-week trial before Judge Batts, a jury convicted Ocasio on all thirteen counts brought against him: (1) participation in the conduct of a racketeering enterprise, in violation of 18 U.S.C. § 1962(c), through the predicate racketeering acts of murder, attempted murder, conspiracy to commit murder, and narcotics trafficking; (2) conspiracy to conduct and to participate in the affairs of a racketeering enterprise, in violation of 18 U.S.C. § 1962(d); (3) conspiracy to murder Kelvin Lyons and Joseph Hendrickson for the purpose of maintaining position in a racketeering enterprise, in violation of 18 U.S.C. § 1959(a)(5); (4) attempted murder of Lyons, in violation of 18 U.S.C. §§ 1959(a)(5) and 2; (5) murder of Rufus Brown, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (6) conspiracy to murder Robert Antonetti, in violation of 18 U.S.C. § 1959(a)(5); (7) murder of Robert Antonetti, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (8) conspiracy to murder Axel Antonetti, in violation of 18 U.S.C. § 1959(a)(5); (9) murder of Axel Antonetti, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (10)

---

[1] The following factual background is drawn from the Second Circuit's opinion affirming Ocasio's conviction, *United States v. Carrillo*, 229 F.3d 177 (2d Cir. 2000), Judge Batts's opinion denying Ocasio's first Section 2255 motion, *Ocasio v. United States*, Nos. 08 Civ. 1305 (DAB), 95 Cr. 942 (DAB), 2012 WL 3245419 (S.D.N.Y. Aug. 9, 2012), the transcript of Ocasio's 1997 trial before Judge Batts, Dkts. 108-113 ("Tr."), the copy of the original indictment which was included in Ocasio's co-defendant's direct appeal brief, *see United States v. Ocasio*, No. 98-1409 (L), 1999 WL 33628832 (2d Cir. 1999) at 25-68 (brief and partial appendix) ("Original Indictment"), and the Presentence Investigation Report prepared by the Probation Department in connection with Ocasio's sentencing, Dkt. 361, Exh. 1 ("PSR"), which the Government filed under seal with its February 12, 2021 opposition to Ocasio's instant Section 2255 motion.

Except where otherwise indicated, all docket citations refer to the docket in the underlying criminal matter, *United States v. Ronald Ocasio*, No. 95 Cr. 942 (JPC) (S.D.N.Y.).

conspiracy to distribute and to possess with intent to distribute heroin and cocaine base, in violation of 21 U.S.C. § 846; (11) using and carrying a firearm during and in relation to the conspiracy to murder Lyons and Hendrickson, the attempted murder of Lyons, and the murder of Brown, in violation of 18 U.S.C. §§ 924(c) and 2; (12) using and carrying a firearm during and in relation to the conspiracy to murder and the murder of Robert Antonetti, in violation of 18 U.S.C. §§ 924(c) and 2; and (13) using and carrying a firearm during and in relation to the conspiracy to murder and the murder of Axel Antonetti, in violation of 18 U.S.C. §§ 924(c) and 2.  Tr. at 3636:25-3643:24 (reading of the verdict); *see also* Original Indictment; Dkt. 152 (noting use of redacted indictment with renumbered counts for jury deliberation purposes).

At Ocasio's trial, four cooperating co-defendants and other witnesses, including law enforcement officers, testified to the Bryant Boys' enterprise's organization and history, as well as Ocasio's role in leading the enterprise.  *Ocasio*, 2012 WL 3245419, at *2.  The cooperating witnesses included three former Bryant Boys members—Arnold Rodriguez (also known as "Chino"), Jose Serrano (also known as "Shorty"), and Lyons (also known as "Peanut")—and Albert Tirado, one of the enterprise's heroin suppliers.  *Id.*  Of particular relevance to Ocasio's instant Section 2255 motion, Luz Acevedo ("Acevedo") offered eyewitness testimony concerning Ocasio's murder of Carl Norris (also known as "Beanie").  *See* Tr. at 1085:17-1131:19.

As demonstrated at trial, the Bryant Boys' enterprise operated from the mid-1980s to the early 1990s primarily in the Bronx, selling narcotics, including "crack" cocaine and heroin, and preserving its influence in the area through violence, murder, and intimidation.  PSR ¶¶ 56-57. Ocasio co-led the enterprise until 1992, when Ocasio, following a "war" with his co-leader Xavier Carrillo, became the enterprise's sole leader.  *Id.* ¶¶ 64, 162.  Between 1992 and 1994, Ocasio also allowed members of the Bryant Boys to organize and maintain separately their own narcotics

3

distribution networks, each which further engaged in acts of violence, including attempted murder and murder. *See, e.g.*, *id.* ¶¶ 180-183 (describing activities of the "Stroud Enterprise"), 184-193 (describing activities of the "Beniquez Enterprise").

Through his leadership of the Bryant Boys, Ocasio was himself involved in over thirteen attempted murders and murders. *Id.* ¶ 99 (explaining that Ocasio participated in the attempted murders of Jose Sanchez, Rudolph Wyatt, Lyons, Hendrickson, Luz Figueroa, and several New York City Police Department ("NYPD") officers, as well as the murders of Norris, Cartrell Campbell, Brown, Robert Antonetti, Axel Antonetti, Manny Burgos, Russell Wilson, and Zoilin Pabellon). Ocasio's VICAR and Section 924(c) charges were predicated on five of these murders and attempted murders, which arose out of three separate incidents.

The first occurred during the 1992 "war" with Carrillo, when Ocasio came to believe that Carrillo had hired Lyons and Hendrickson to kill Ocasio. *Id.* ¶¶ 159, 160. In November of that year, members of the Bryant Boys reported spotting Lyons and Hendrickson on the street. *Id.* ¶ 160. Although they had correctly identified Lyons, the man they believed was Hendrickson was in fact Brown, Lyons's employee. *Id.* Ocasio shot and killed Brown, and another Bryant Boys member shot at Lyons, who survived the attack. *Id.*

The second and third incidents involved brothers Robert Antonetti and Axel Antonetti. Sometime after the fallout with Carrillo, Ocasio hired Axel to sell drugs for the enterprise during the overnight shift. *Id.* ¶ 163. When Ocasio learned that Axel's brother Robert was robbing the Bryant Boys and their customers of money and drugs, Ocasio hired Len Saunders to kill Robert. *Id.* ¶ 167. Saunders, assisted by another Bryant Boys member, shot Robert to death in April 1993. *Id.* Soon thereafter, when Bryant Boys workers and customers began complaining that Axel was

robbing them, Ocasio hired Saunders to kill Axel. *Id.* ¶ 170. And in September 1992, Saunders—once again assisted by the same Bryant Boys member—shot and killed Axel. *Id.*

Ocasio's participation in the murders of Brown, Robert Antonetti, and Axel Antonetti and in the attempted murders of Lyons and Hendrickson additionally underlay four of the nine predicate acts charged by the Government in connection with the substantive RICO and RICO conspiracy counts brought against Ocasio. Tr. at 3510:23-3534:24 (jury charge on the nine charged racketeering acts). The remaining five predicate acts include conspiracy to distribute narcotics (Racketeering Act Nine), the attempted murder of Jose Sanchez (also known as "Tito") (Racketeering Act One), the attempted murder of Wyatt (also known as "Buzzy") and conspiracy of the same (Racketeering Act Two), the murder of Cartrell Campbell (Racketeering Act Four), and—most relevant to the instant motion—the murder of Norris (Racketeering Act Three). *Id.*[2]

As earlier mentioned, the Government offered testimony on the Norris murder from Acevedo. *Id.* at 1085:17-21. Acevedo had previously testified at Ocasio's 1994 state trial, *id.* at 1131:22-1132:16, at which Ocasio was convicted of that murder, PSR ¶ 297.

Before calling Acevedo, the Government moved *in limine* to preclude cross-examination on her prior arrest, which involved accusations that as president of the Parent Teacher Association ("PTA") for P.S. 48, Acevedo had signed blank checks and stolen money from the organization. *See* Dkt. 434, Exh. A (Government's February 18, 1997 letter motion). The Government explained that it disclosed "to the defense long ago" the circumstances of that arrest. *Id.* at 1. The Government further represented that Acevedo had voluntarily surrendered, that no formal charges were ever returned, and that she ultimately paid $800 in restitution. *Id.* The Government argued

---

[2] The Government also presented evidence of the killings of Burgos and Pabellon, among others, to further demonstrate that "each of the killings . . . [was] part and parcel of the operation of the Bryant Boys' enterprise, of the narcotics conspiracy." Tr. at 3173:7-17.

that Acevedo's arrest was not a proper subject for cross-examination under Federal Rule of Evidence 609, given the rule's limited applicability to convictions, and further that the Court should exercise its discretion to preclude cross-examination under Rule 608(b) because "the charges were dismissed or were not even officially initiated." *Id.* at 2.  The day after the motion was filed, Judge Batts asked Ocasio's defense counsel if he intended to question Acevedo about the arrest.  Tr. at 786:8-10.  Defense counsel answered, "No," *id.* at 786:10, and Judge Batts added, "[I]t is understood, it is a standing rule in this court that investigation by defense into prior arrests that have not resulted in convictions is assumed a forbidden area that will not be gotten into," *id.* at 786:11-15.  Defense counsel responded, "No argument." *Id.* at 786:25.

In that same mid-trial colloquy with Judge Batts, defense counsel raised what he characterized as a potential *Giglio* problem.  He argued that, to the extent Acevedo "testif[ies] differently on any point in substance" from her 1994 state trial testimony, he should be "informed of that as a *Giglio* disclosure" in advance of her testimony at the federal trial. *Id.* at 789:23-792:5. Elaborating on this concern, Ocasio's counsel explained that the Government was advancing a "two-shooter theory" that implicated in the Norris murder both Ocasio and his brother, Will Ocasio, who at that point had already pleaded guilty to attempted murder of Norris. *Id.* at 794:12-19.  Indeed, Rodriguez, a cooperating witness, had testified at the federal trial a week before that, on the night of the Norris murder, he saw "Will chasing Beanie [Norris] up the block towards Lafayette shooting at him," *id.* at 217:4-10, and that he subsequently ran into a building at 1314 Seneca Avenue, from which he next saw Ocasio "walking on another street on Bryant Avenue walking up towards Lafayette saying where he's at, where he's at with a gun in his hand," *id.* at 218:19-24.  According to Rodriguez, Ocasio and Will entered the 1314 Seneca Avenue building "[a] couple of minutes later," with Ocasio carrying a handgun and Will carrying a submachine

gun. *Id.* at 219:11-13, 220:10.  Rodriguez further testified that Ocasio later told him (after Ocasio was arrested for the Norris murder) that "Will chased [Norris] and shot him, that he had ran out of bullets and [Norris] was on his hands and knees crawling" and that Ocasio "ran around [Norris] and shot him one time in the head." *Id.* at 228:13-19.

Ocasio's counsel maintained that this "two-shooter theory," was "widely different from the state court prosecution." *Id.* at 794:12-19.  At Ocasio's state trial, Acevedo had testified that, on October 21, 1990 (the date of the Norris murder), she heard shots outside of her apartment, looked out of her window, and "saw a male Hispanic chasing a male [B]lack"; she continued, "He [Ocasio] shot him [Norris] . . . .  He [Ocasio] had run down the corner of Seneca, came back and shot him [Norris] again three times." *Id.* at 800:15-801:14 (defense counsel reading Acevedo's state testimony).  In defense counsel's view, Acevedo's state testimony indicated that she saw only one shooter that evening. *Id.* at 804:22-25.  Judge Batts disagreed that such a conclusion was "clear-cut," but agreed that the defense had a "good-faith basis to try and argue that." *Id.* at 805:1-12.

The Government called Acevedo as a witness the next day. *Id.* at 1085:17-21.  Acevedo testified that sometime in October 1990 she witnessed Ocasio, whom she had seen in her neighborhood approximately "a hundred" times, shoot a man later identified as Norris. *Id.* at 1092:9-1095:8, 1102:8-13.  Specifically, she testified that while she was watching television in her apartment, she heard shots outside her window. *Id.* at 1092:20-1093:16.  When she looked out her window, she saw Norris fall to the ground while running. *Id.* at 1094:18-1095:2.  According to Acevedo, while Norris was on the ground, Ocasio approached him and shot him three times. *Id.* at 1093:12-16, 1095:3-9.  Acevedo further testified that she saw another male standing next to Ocasio during this incident, *id.* at 1095:9-22, and that after the shooting, Ocasio "started walking towards Lafayette," *id.* at 1104:15-18.

Acevedo's testimony of the events surrounding Norris's murder at the federal trial was consistent with Rodriguez's testimony and was further corroborated by testimony from cooperating witness Serrano, defense witness Ramon Acevedo (Acevedo's husband), Detective Anthony Tota, and medical examiner Dr. John Pearl. *See, e.g.*, *id.* at 1308:20-1310:17 (Serrano testifying that he discussed the October 1990 shooting with other Bryant Boys members who told him that "Ron and his brothers . . . killed Beanie [Norris], and they tried to kill Buzzy and another kid that was with them"); *id.* at 2998:17-20 (Ramon Acevedo testifying with respect to the October 1990 shooting that he "saw Ocasio walking up from . . . Seneca towards Lafayette, [and Ocasio] walked towards to the victim, who was laying down on the floor, and shot him a couple of times"); *id.* at 2816:10-14 (Detective Tota's expert testimony regarding the absence of enough information to conclude that the three bullets recovered from Norris's body came from the same gun as other bullets recovered from the crime scene or from other victims); *id.* at 2205:12-22 (Dr. Pearl's expert testimony that three of the wounds found on Norris's back were consistent with somebody running from a shooter and being shot in the back); *id.* at 2207:10-24 (Dr. Pearl's expert testimony that the wound in Norris's head was not consistent with somebody being chased or with the shooter and victim being on "the same level" because "the trajectory of the wound [was] sharply downward"). Moreover, Acevedo was subject to extensive cross-examination by Ocasio's counsel, particularly with respect to the perceived inconsistencies between her present testimony and her earlier testimony at Ocasio's state trial and with respect to her inability to recall details three years after that state trial. *Id.* at 1131:22-1175:9.

Rodriguez and Serrano, too, were subject to extensive cross-examination, particularly as to their credibility. For instance, Ocasio's counsel questioned Rodriguez about the frequency with which he lied to his probation officer while serving five years of probation after his first arrest at

seventeen years old, *id.* at 619:15-621:10; the numerous assaults and attempted murders he committed while on probation, *id.* at 621:11-14; Rodriguez's role in killing Burgos, *id.* at 622:21-23; Rodriguez's lies to the prosecutors during the investigation of that murder, *id.* at 628:1-4; and Rodriguez's decision to enter into a cooperation government with the Government with respect to the instant indictment, *id.* at 811:9-817:10. As to Serrano, Ocasio's counsel bore out the details of Serrano's false statements to the prosecutors concerning Burgos's murder, *id.* at 1593:25-1595:23, 1602:6-1603:10, and the fact that Serrano and Rodriguez were housed in the same unit in the Metropolitan Correctional Center ("MCC") and had shared a room there, *id.* at 1605:13-1612:11. Finally, Judge Batts included in the jury charge thorough witness credibility instructions, addressing both false testimony and accomplice testimony. *Id.* at 3485:13-3489:22.

In convicting Ocasio of the two RICO offenses (substantive and conspiracy), the jury made express findings that Ocasio had murdered Norris. *Id.* at 3637:16-18 (jury finding Ocasio guilty of committing the racketeering predicate act of murdering Norris with respect to Count One), 3639:22-24 (jury finding Ocasio guilty of committing the racketeering predicate act of murdering Norris with respect to Count Two). In fact, the jury concluded that Ocasio had committed all nine charged racketeering predicate acts. *Id.* at 3637:5-3638:23 (jury finding Ocasio guilty of all nine racketeering acts as to Count One); 3639:3-3641:2 (jury finding Ocasio guilty of all nine racketeering acts as to Count Two). As earlier mentioned, included in the other charged racketeering predicates were the murders of Robert Antonetti (Racketeering Act Seven), Axel Antonetti (Racketeering Act Eight), and Brown (Racketeering Act Six), and the attempted murders of Lyons and Hendrickson (Racketeering Act Five). *Id.* at 3637:5-3641:2.

With respect to the VICAR charges, the jury separately found Ocasio guilty of conspiracy to murder Lyons and Hendrickson (Count Three), conspiracy to murder Robert Antonetti (Count

Six), and conspiracy to murder Axel Antonetti (Count Eight), as well as the attempted murder of Lyons and aiding and abetting (Count Four), the murder of Brown and aiding and abetting (Count Five), the murder of Robert Antonetti and aiding and abetting (Count Seven), and the murder of Axel Antonetti and aiding and abetting (Count Nine).  *Id.* at 3641:11-3642:12 (reading of the verdict for Counts Three through Nine).  And with respect to the Section 924(c) charges, the jury found Ocasio guilty of using and carrying a firearm in connection with the conspiracy to murder Lyons and Hendrickson, the attempted murder of Lyons, and the murder of Brown (Count Eleven); the conspiracy to murder and the murder of Robert Antonetti (Count Twelve); and the conspiracy to murder and the murder of Axel Antonetti (Count Thirteen).  *Id.* at 3643:7-24 (reading of the verdict for Counts Eleven through Thirteen).

## II.  Procedural Background

On July 20, 1998, Judge Batts sentenced Ocasio to a term of life imprisonment and a consecutive forty-five-year term of imprisonment.  *Ocasio*, 2012 WL 3245419, at *1; Dkt. 45 (judgment).  A month later, Ocasio appealed his conviction, urging, *inter alia*, reversal of certain counts—*i.e.*, those premised on racketeering acts consisting of conspiracy to murder Wyatt, Robert Antonetti, Axel Antonetti, Lyons, and Hendrickson—given the district court's failure to deliver the defense's requested jury charge on the overt act requirement to prove conspiracy under New York State law.  Dkt. 134 (notice of appeal); *see United States v. Carrillo*, 229 F.3d 177, 179 (2d Cir. 2000) (describing Ocasio's ten arguments and dismissing nine of them as "insubstantial and requir[ing] no discussion").  Finding that the district court's failure to charge the jury on the overt act requirement "had no practical effect" because the jury had, in any event, *necessarily* found an overt act committed in furtherance of each murder conspiracy (with the overt acts being the murders of Robert Antonetti, Axel Antonetti, and Brown, who had been mistaken for Hendrickson,

as well as the attempted murders of Wyatt and Lyons), the Second Circuit upheld Ocasio's conviction. *Carrillo*, 229 F.3d at 186.

In February 2008, Ocasio filed his first Section 2255 motion, claiming that the Government's cooperating witnesses, some of whom were housed in the same unit in the MCC, had met before Ocasio's trial to "fabricate[] and rehearse[]" their purportedly false trial testimony. *See Ocasio v. United States*, No. 08 Civ. 1305 (DAB) (S.D.N.Y.) ("First Habeas Matter"), Dkt. 1. On August 9, 2012, Judge Batts denied the motion and declined to issue a certificate of appealability, finding that the "MCC housing issue and the potential for perjury" were presented to the jury and "discussed at great length and in extensive detail" at trial. *Ocasio*, 2012 WL 3245419, at *4. Ocasio subsequently moved for reconsideration of that decision and, at the same time, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Dkt. 365. On January 25, 2013, Judge Batts denied the reconsideration motion and dismissed the Section 2241 petition for lack of jurisdiction. First Habeas Matter, Dkt. 12. Ocasio appealed the decision, and on June 10, 2013, the Second Circuit dismissed the appeal. *Id.*, Dkt. 13. In February 2014, Ocasio filed another motion for reconsideration, which Judge Batts denied on May 8, 2014. *Id.*, Dkts. 14, 17. The Second Circuit once again denied Ocasio's appeal of that decision. *Id.*, Dkts. 18-20. In January 2018, Ocasio moved for leave to file a second Section 2255 motion (once again attacking the cooperating witnesses' testimony) and requested appointment of counsel. *Id.*, Dkt. 20. On July 13, 2018, the Second Circuit denied the motion. *Id.*, Dkt. 24.

In early 2019, following the Supreme Court's April 2018 decision in *Sessions v. Dimaya*, 584 U.S. 148 (2018), Ocasio once again sought leave to file a second Section 2255 motion, arguing that *Dimaya* compelled vacatur of his Section 924(c), VICAR, and RICO convictions. *Ocasio v. United States*, No. 19-487 (2d Cir.), Dkt. 1. On April 12, 2019, the Second Circuit stayed the

matter "[i]n light of the pendency of cases before the Supreme Court." *Id.*, Dkt. 32.  In April 2020, after he received sealed records related to Acevedo's prior arrest, Ocasio supplemented his motion before the Second Circuit, further arguing that his convictions were obtained in violation of *Brady* due to the Government's nondisclosure of evidence that could have been used to impeach Acevedo's testimony.  *Id.*, Dkt. 52.  On November 4, 2020, the Second Circuit lifted the stay and determined that Ocasio's motion—inasmuch as it was "based on *Johnson v. United States*, 576 U.S. 591 (2015), *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and *United States v. Davis*, 139 S. Ct. 2319 (2019)," and their impact on his Section 924(c) convictions—on its face satisfied the requirements for a successive habeas motion under Section 2255.  *Id.*, Dkt. 66. at 1-2.  In granting Ocasio leave to file his second motion before this Court, the Second Circuit explained that it had "only concluded that a prima facie showing ha[d] been made as to one" of the claims, and further instructed that this Court would "have the preliminary task of determining whether [all] the claims . . . satisfy the threshold requirements governing successive § 2255 motions, including those set forth in 28 U.S.C. §§ 2244(a), 2244(b)(3)-(4), and 2255(h)."  *Id.* at 2.

On November 17, 2020, the case was reassigned to the undersigned.  And on November 27, 2020, Ocasio filed the instant Section 2255 motion, in which he also requested appointment of counsel.  Dkt. 394 ("Motion") at 19.  On February 12, 2021, the Government opposed Ocasio's challenges to his Section 924(c) convictions as resting on invalid predicates and to the VICAR statute as unconstitutionally vague, but joined in Ocasio's request for the appointment of counsel to investigate the alleged *Brady* violations.   Dkt. 396 ("Opposition").  On February 23, 2021, this Court granted the request for appointment of counsel and authorized counsel to file a supplemental brief on Ocasio's *Brady* claims.  Dkt. 399.  Appointed counsel appeared for Ocasio on February 25, 2021.  Dkt. 400.  But on August 21, 2021, he moved to withdraw from the case, explaining:

> After considerable time and a number of conversations with Mr. Ocasio, we have decided that I will not be filing a memorandum of law in support of the *Brady* claim in his § 2255 motion, and I respectfully ask to be relieved.  However, Mr. Ocasio continues to litigate his issues with great diligence and he wishes to pursue the *Brady* claim *pro se*.

Dkt. 414.  This Court granted the motion to withdraw on August 30, 2021.  Dkt. 415.

On March 11, 2022, Ocasio, proceeding *pro se*, filed a supplemental brief, in which he responded to the Government's previous opposition, reiterated his prior arguments, and further elaborated on his *Brady* claims.  Dkts. 426 ("Suppl. Br."), 427-428.  In that submission, he added that the Government had also failed to disclose the "DD5 [police report] memorializ[ing] the account of an unidentified Hispanic," who reported to the police the day after the Norris murder "what she saw and heard immediately before and after the shooting," including that she ran into Ocasio running up the stairs of her building immediately after she heard the shots.  Suppl. Br. at 27-28.

On April 15, 2022, the Government filed a supplemental letter brief in further opposition to Ocasio's Section 2255 motion, urging that Ocasio's *Brady* claims are meritless.  Dkt. 434 ("Suppl. Opposition").[3]  On August 10, 2022, Ocasio replied.  Dkt. 440.

---

[3] In this submission, the Government stated that the Norris murder "was not charged as a RICO predicate or a separate VICAR count in the federal case."  Suppl. Opposition at 2; *see also id.* at 4 ("None of the charges in the federal indictment are predicated on the Norris murder.").  On May 10, 2024, the Court directed the Government to clarify its position that the Norris murder was not a charged RICO predicate act, given that the Presentence Investigation Report, as well as the jury charge and verdict as reflected in the trial transcript, indicated otherwise.  Dkt. 441.  The Government responded that the Norris murder was indeed charged as a RICO predicate, but added that it "does not believe this affects the defendant's claims in any material way, given the other arguments advanced by the Government in its April 29, 2022 letter about the lack of a *Giglio*/*Brady* violation in this case."  Dkt. 442.

### III.  Legal Standard

Under 28 U.S.C. § 2255(a), a prisoner in custody for a federal sentence may move for his or her sentence to be vacated, set aside, or corrected on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  The prisoner may gain such relief "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)); *accord Lanier v. United States*, Nos. 15 Cr. 537 (VEC), 23 Civ. 4939 (VEC), 2024 WL 1715236, at *2 (S.D.N.Y. Apr. 22, 2024).

Where, as here, a defendant seeks a second or successive Section 2255 motion in a district court, the defendant must "first obtain[] an order from the court of appeals authorizing consideration of the successive motion."  *Vu v. United States*, 648 F.3d 111, 113 (2d Cir. 2011) (citing 28 U.S.C. § 2255(h)).  To grant such authorization, the Court of Appeals must determine whether any claim in the motion on its face relies on

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
>
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h); *accord United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003) ("The court of appeals must examine the [successive] application to determine whether it contains any

claim that satisfies . . . § 2255[(h)].[4]  If so, the court should authorize the prisoner to file the entire application in the district court, even if some of the claims in the application do not satisfy the applicable standards."), *abrogated on other grounds by United States v. McRae*, 793 F.3d 392, 401 (4th Cir. 2015).  This *prima facie* finding, however, is "not a finding that [the movant] actually satisfied those requirements." *Massey v. United States*, 895 F.3d 248, 251 (2d Cir. 2018).  After a defendant obtains leave from the Court of Appeals, "the district court must dismiss any claim presented in an authorized second or successive application unless the applicant shows that the claim satisfies" those requirements.  *Magwood v. Patterson*, 561 U.S. 320, 331 (2010).  If any claim in the second Section 2255 motion "fails to satisfy those threshold requirements, [the court] need not reach the merits of [the movant's] claim." *Massey*, 895 F.3d at 251 (citing 28 U.S.C. § 2255(h)).

Finally, to warrant an evidentiary hearing, a defendant must "set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."  *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013) (internal quotation marks omitted).  A "defendant need establish only that he has a plausible claim . . . , not that he will necessarily succeed on the claim."  *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks omitted).   A *pro se* movant is "generally . . . entitled to a liberal construction of [his] pleadings, which should be read to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotation marks omitted).  Nevertheless, a court may summarily dismiss a Section 2255 motion "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior

---

[4] *Winestock* cited the version of Section 2255 in effect at the time of that decision, which contained identical threshold language currently at Section 2255(h), but without that language relegated to a particular subsection.

proceedings in the case that the movant is not entitled to relief." *Armienti v. United States*, 234
F.3d 820, 823 (2d Cir. 2000) (internal quotation marks omitted).  Finding here that "[t]he combined
submissions of the parties provide a sufficient basis upon which to deny the [motion]," the Court
concludes that an evidentiary hearing is unnecessary.  *Pinhasov v. United States*, Nos. 16 Civ.
7349 (KBF), 14 Cr. 670 (KBF), 2018 WL 550611, at *2 (S.D.N.Y. Jan. 22, 2018) (citing *Chang
v. United States*, 250 F.3d 79, 86 (2d Cir. 2001)); *see also Camacho v. United States*, No. 13 Cr.
58 (KBF), 2018 WL 357312, at *1 n.1 (S.D.N.Y. Jan. 10, 2018) ("[T]he petition raises no factual
dispute and can thus be resolved without a Government response and/or hearing.").

## IV.  Discussion

Between his filings before the Second Circuit and this Court, Ocasio argues that: (1) his
RICO and VICAR convictions must be vacated because, under *Dimaya*, these statutes are
unconstitutionally vague, *see Ocasio v. United States*, No. 19-487 (2d Cir.), Dkt. 1 at 14-18; *see
also* Dkt. 391 at 33-36; (2) his Section 924(c) convictions must be vacated under *Davis* for resting
on an invalid predicate—*i.e.*, conspiracy to murder, *see* Motion at 10-14; and (3) his convictions
were obtained in violation of *Brady* and *Giglio*, given the Government's nondisclosure of
Acevedo's case file and the aforementioned DD-5 police report, *see id.* at 14-19.  Where, as here,
the Court of Appeals "has authorized the filing of a successive petition that may include a mix of
authorized and unauthorized claims, the district court must examine each claim and dismiss those
that are barred under Section 2255."  *Tellier v. United States*, Nos. 20 Civ. 422 (AJN), 92 Cr. 869
(AJN), 2021 WL 4556239, at *4 (S.D.N.Y. Oct. 5, 2021).

### A.    Ocasio's Challenges under *Johnson*, *Dimaya*, and *Davis*

In challenging his RICO, VICAR, and Section 924(c) convictions, Ocasio invokes the
Supreme Court's decisions in *Johnson*, *Dimaya*, and *Davis*, which invalidated as

unconstitutionally vague the "residual" clauses contained within various statutory definitions of violent crimes.  *See Johnson*, 576 U.S. at 606 (deeming unconstitutional the imposition of a sentencing enhancement under the Armed Career Criminal Act's residual clause, 18 U.S.C. § 924(e)(2)(B), which defines a "violent felony" to include a felony that "involves conduct that presents a serious potential risk of physical injury to another"); *Dimaya*, 584 U.S. at 174-75 (deeming unconstitutionally vague the residual clause contained in the Immigration and Nationality Act's "crime of violence" definition, 18 U.S.C. § 16(b), which extends that definition to "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense");  *Davis*, 588 U.S. at 470 (deeming unconstitutionally vague Section 924(c)'s residual clause, 18 U.S.C. § 924(c)(3)(B), which defines a "crime of violence" to include a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense").  The Court considers at the threshold whether Ocasio's claims rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," given that the "newly discovered evidence" requirement plainly does not apply to these challenges.  28 U.S.C. § 2255(h).

### 1.  Claims Regarding Ocasio's VICAR and RICO Convictions

Ocasio appears to contend that the VICAR and RICO statutes are unconstitutionally vague, and that his convictions under those statutes must thus be vacated.  Dkt. 391 (Ocasio's application to the Second Circuit for leave to file a second Section 2255 motion) at 33-36.  Specifically, he seems to argue that the "pattern of racketeering activity" element in the RICO statute is inadequately defined, giving rise to unpredictability and uncertainty around what conduct is

proscribed under that statute.  *Id.* at 33-35.[5]  He further argues that because the VICAR statute does not have a requirement "that the government prove the predicate activities were related and that they created a threat of continued activity," the statute "creates 'uncertainty' and 'contradictions.'"  *Id.* at 34-35.  Lastly, he insists that inclusion of the phrase "any offense . . . otherwise dealing in a controlled substance" in the definition of "racketeering activity" in 18 U.S.C. § 1961(1)(D), renders the term (as used in both the RICO and VICAR statutes) unconstitutionally vague, and that conspiracy to distribute controlled substances thus falls outside the definition of "racketeering activity."  *Id.*

Because the "new rule[s] of constitutional law" announced in *Johnson* and *Dimaya* (and *Davis*, for that matter) have no bearing on Ocasio's convictions under the VICAR and RICO statutes, Ocasio's claims cannot be found to "rely" on those rules.  *Cf. United States v. Aquart*, 92 F.4th 77, 94 (2d Cir. 2024) ("*Davis* sheds little light on whether the categorical approach might apply to [the defendant]'s VICAR murder counts of conviction."); *Massey v. United States*, 895 F.3d 248, 252 (2d Cir. 2018) (finding that the movant's claim did not rely on *Johnson* for purposes of Section 2255(h) "because his sentence was not in any way predicated on the portion of the ACCA invalidated by that case"); *Aller v. United States*, Nos. 16 Civ. 9504 (CM), 00 Cr. 977 (CM), 2018 WL 4579829, at *2 (S.D.N.Y. Aug. 17, 2018) (rejecting a challenge to the RICO statute as unconstitutionally vague because of its inadequate description of "pattern of racketeering activity" and reference to "otherwise dealing" in its definition of "racketeering activity," and explaining that "there [was] no reason why the analysis of *Johnson* should unsettle this Circuit's

_____

[5] Ocasio appears to direct this challenge at both the RICO statute and the VICAR statute. *See* Dkt. 391 at 35 ("The definition of 'pattern of racketeering activity' in §1959 and §1961 invite[s] such uncertainty and arbitrary enforcement . . . .").  As the VICAR statute lacks reference to a "pattern of racketeering activity," *see generally* 18 U.S.C. § 1959, however, the Court construes Ocasio's challenge as raised only in the context of the RICO statute.

longstanding jurisprudence with respect to the RICO statute").  The Court thus dismisses Ocasio's claims attacking his VICAR and RICO convictions because he fails to satisfy the threshold requirements in 28 U.S.C. § 2255(h).

In any event, Ocasio's challenges to these statutes as unconstitutionally vague are without merit.  First, vagueness challenges to the RICO statute are evaluated on the facts of the given case, and here, given Ocasio's central role in directing the Bryant Boys' narcotics distribution network and in orchestrating and committing acts of violence, Ocasio was plainly on notice that his conduct subjected him to RICO penalties.  *See United States v. Burden*, 600 F.3d 204, 228 (2d Cir. 2010) (concluding that the application of the RICO statute to the defendant was not unconstitutionally vague because the "record support[ed] a finding that [the defendant] was deeply involved in the narcotics conspiracy and a key figure in planning and carrying out acts of violence . . . as part of an organized response"); *United States v. Pungitore*, 910 F.2d 1084, 1102-05 (3d Cir. 1990) (rejecting a vagueness challenge to the RICO statute, noting that any potential due process problems are not present in organized crime cases).  Indeed, the Second Circuit has consistently rejected vagueness challenges to the RICO statute "in a variety of applications." *United States v. Coiro*, 922 F.2d 1008, 1016-17 (2d Cir. 1991) (collecting cases).  Ocasio's vagueness challenge to the VICAR statute also fails for the same reason.  *Cf. United States v. Gills*, 702 F. App'x 367, 377 (6th Cir. 2017) (rejecting a vagueness challenge as applied to the defendant, whose VICAR conviction was predicated on the jury's determination that the defendant had committed murder to increase his standing in the defendant's street gang).  Second, it is well established that "'[c]onspiracies to violate the [controlled substances] law, if proven, are properly chargeable as predicate acts'" defined in 18 U.S.C. § 1961(1).  *United States v. Awad,* 518 F. Supp. 2d 577, 583 (S.D.N.Y. 2007) (second brackets in original) (quoting *United States v. Benevento*, 836 F.2d 60,

72 (2d Cir. 1987), *abrogated on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989)); *see also United States v. Jones*, 482 F.3d 60, 71 (2d Cir. 2006) (treating narcotics conspiracy as a RICO predicate act).

### 2.   Claim Regarding Ocasio's Section 924(c) Convictions

While Ocasio's *Davis* claim with respect to his Section 924(c) convictions clears the Section 2255(h)(2) threshold, it fails on its merits.

As relevant here, 18 U.S.C. § 924(c) criminalizes the use or carrying of a firearm "during and in relation to any crime of violence." 18 U.S.C. § 924(c)(1)(A). The statute in turn defines a "crime of violence" in two clauses. First, the "elements clause" defines a crime of violence as any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A). Second, the "residual clause" defines such a crime as any felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* § 924(c)(3)(B). After *Davis*, which invalidated the residual clause, 588 U.S. at 470, a Section 924(c) conviction remains valid only if it rests on a predicate offense captured by the elements clause. *Stone v. United States*, 37 F.4th 825, 831 (2d Cir. 2022).

In determining whether a predicate offense satisfies Section 924(c)(3)(A)'s elements clause, courts ordinarily employ the "categorical approach," examining only the elements of the crime of conviction and determining whether the "minimum criminal conduct necessary for conviction" meets the requirements set forth in that clause. *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018) (citations omitted). But divisible statutes—*i.e.*, those listing elements in the alternative and thereby defining multiple crimes—require use of the "modified categorical approach," which allows courts to examine "a limited class of documents (for example, the

20

indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *United States v. Davis*, 74 F.4th 50, 53 (2d Cir. 2023) (citations omitted). The court thereafter "return[s] to the categorical analysis and compare[s] the elements of the offense of conviction with section 924(c)(3)(A)'s definition of a crime of violence." *Id.* (citation omitted). Finally, "in the context of a § 924(c) conviction, where a jury's finding of guilt is based on two predicates, only one of which can lawfully sustain guilt," the conviction may be sustained if "the jury would have found 'the essential elements of guilt on [an] alternative charged predicate that would sustain a lawful conviction' beyond a reasonable doubt." *Stone*, 37 F.4th at 831.

Here, each of Ocasio's three Section 924(c) offenses was predicated on both substantive murder and conspiracy to murder. Specifically, in Count Eleven, Ocasio was charged with the use and carrying of firearms in relation to the conspiracy to murder Lyons and Hendrickson, the attempted murder of Lyons, and the murder of Brown, as charged in Racketeering Acts Five and Six of Counts One and Two and separately as VICAR offenses in Counts Three, Four, and Five. *See* Tr. at 3556:19-3557:5; Indictment ¶¶ 20-27 (Counts Three through Five). In Count Twelve, Ocasio was charged with the use and carrying of firearms in relation to the conspiracy to murder and the murder of Robert Antonetti, as charged in Racketeering Act Seven of Counts One and Two and separately as VICAR offenses in Counts Six and Seven. *See* Tr. at 3557:6-15; Indictment ¶¶ 28-31 (Counts Six and Seven). Finally, in Count Thirteen, Ocasio was charged with the use and carrying of firearms in relation to the conspiracy to murder and the murder of Axel Antonetti, as charged in Racketeering Act Eight of Counts One and Two and separately as VICAR offenses

in Counts Eight and Nine.  *See* Tr. at 3557:16-3558:1; Indictment ¶¶ 32-35 (Counts Eight and Nine).[6]

In urging vacatur of these convictions, Ocasio argues that conspiracy to murder cannot support a valid Section 924(c) conviction—which premise the Government concedes is "likely" correct, Opposition at 4[7]—and that "the record only supports the conspiracies with any certain[t]y."  Motion at 11.  Ocasio further argues that substantive murder, too, fails to qualify as a crime of violence under the elements clause.  *Id.* at 13-14.

Ocasio's arguments are not persuasive.  To start, the substantive murder offenses underlying each of Ocasio's Section 924(c) convictions qualify as crimes of violence and thus were valid predicates.  Ocasio submits that because murder *can be* committed recklessly under New York law, it categorically falls outside the scope of the elements clause definition of a crime of violence.  *Id.* at 13-14.  But this argument ignores the applicability of the modified categorical approach.

Each of Ocasio's Section 924(c) firearms charges was based—at least in part—on VICAR murder and aiding and abetting the same, in violation of 18 U.S.C. § 1959(a)(1) and (2), as charged separately in Counts Five (murder of Brown), Seven (murder of Robert Antonetti), and Nine (murder of Axel Antonetti).  Tr. at 3545:17-3546:7 (describing Count Five), 3546:25-3547:15

---

[6] The numbering for the racketeering acts as reflected in the transcript of the jury charge does not correspond to the numbering found in the Original Indictment, as the racketeering acts were renumbered in the redacted indictment that was presented to the jury.  *See* Dkt. 152 (stipulation and order entered on August 25, 1998 describing the redacted indictment); *id.*, Exh. A (a copy of the redacted indictment).

[7] Indeed, "a mere conspiracy to commit a crime of violence will ordinarily fail to qualify" as a crime of violence under the elements clause.  *United States v. Erbo*, No. 08 Civ. 2881 (LAP), 2020 WL 6802946, at *2 (S.D.N.Y. Nov. 19, 2020); *see United States v. Barrett*, 937 F.3d 126, 128 (2d Cir. 2019) (vacating Section 924(c) conviction predicated on Hobbs Act robbery conspiracy), *abrogated on other grounds by Lora v. United States*, 599 U.S. 453 (2023).

(describing Count Seven), 3548:8-24 (describing Count Nine); *see* Indictment ¶¶ 26-27 (Count

Five), 30-31 (Count Seven), 34-35 (Count Nine).  The Second Circuit has held that, for purposes

of determining whether a substantive VICAR offense constitutes a valid predicate for a Section

924(c) conviction, the modified categorical approach applies.  *Davis*, 74 F.4th at 53-54 (rejecting

the argument that the VICAR murder statute is indivisible).  Accordingly, this Court is initially

tasked with determining precisely what crime and what elements Ocasio was charged with in

connection with these VICAR offenses.  Because a substantive VICAR offense, in turn, hinges on

a further underlying predicate offense, the Court's inquiry boils down to whether that underlying

offense constitutes a crime of violence.  *Id.*

Here, Ocasio's VICAR charges hinged on Ocasio having committed murder in violation

of New York Penal Law Section 125.25.  Original Indictment ¶¶ 27, 31, 35.  Section 125.25,

captioned "Murder in the second degree," is further divided into five subsections and "plainly

'criminalizes multiple acts in the alternative, thereby defining multiple crimes.'"  *Boykin v. United*

*States*, Nos. 16 Civ. 4185 (CM), S11 10 Cr. 391-61 (CM), 2020 WL 774293, at *6 (S.D.N.Y. Feb.

18, 2020); *see* N.Y. Penal Law § 125.25(1)-(5) (describing, among other crimes, intentional

murder in subsection one and murder resulting from recklessness in "circumstances evincing a

depraved indifference to human life" in subsections two and four).  It is thus considered a divisible

statute, *Boykin*, 2020 WL 774293, at *6, that further invites the Court to "peer into the record to

see which of the multiple crimes was implicated," *Davis*, 75 F.4th at 55.

The Indictment charged Ocasio with having "intentionally[] and knowingly murdered"

each of Brown, Robert Antonetti, and Axel Antonetti, in violation of the VICAR statute in Counts

Five, Seven, and Nine, respectively.  Original Indictment ¶¶ 27, 31, 35.  Moreover, in instructing

the jury on Ocasio's murder charges under New York Penal Law Section 125.25 (first in the

context of the RICO predicates charged in Counts One and Two, and later in the context of the

VICAR murder charges), Judge Batts unequivocally described *intentional* murder:

> Section 125.25 of the Penal Law of the State of New York makes it a crime to
> murder another individual.  It is the instructions relating to this state offense that
> you must follow in considering the murder charges contained in the racketeering
> act.  Under New York State Penal Law, a person is guilty of murder when with
> intent to cause the death of another, another person, he causes the death of such
> person or of a third person.  To find that the defendant murdered another individual
> in each racketeering act you are considering, you must find that the government has
> proved beyond a reasonable doubt the following two elements: First, that on or
> about a particular date the defendant intended to cause the death of another person;
> and [s]econd, that on or about the same date, the defendant did in fact cause the
> death of the other person.  Under the murder statute, a person intends to cause the
> death of another person when his conscious aim or objective is to cause the death
> of a person.

Tr. at 3513:11-3514:5; *see also id.* at 3551:17-3552:2 (explaining that the same definition of

murder applies to the VICAR charges, Counts Three through Nine).  Neither the jury instructions

nor the Indictment referred to depraved indifference or reckless murder.

The record is thus clear that Ocasio was charged with and found guilty of *intentional*

second-degree murder under New York law, specifically in violation of Subsection 1 of New York

Penal Law Section 125.25.  *Cf. Davis*, 74 F.4th at 55 (concluding that the jury "necessarily found"

that the defendant intended to cause death, given the district court's instruction that "[u]nder New

York Law, murder requires proving that a person, one, caused the death of a victim; and two, with

the intent of causing the victim's death or another person's death"); *see also United States v.

Pastore*, 83 F.4th 113, 120 n.5 (2d Cir. 2023) (finding that "the district court's jury instructions

made clear that [the defendant] was convicted under § 125.25(1)" where, as here, the trial judge

instructed that the defendant must have had "the intent to cause the death of the victim or another

person").  And intentional murder in violation of Section 125.25(1) undoubtedly qualifies as a

"crime of violence" under the elements clause.  *See Davis*, 74 F.4th at 56 ("Therefore, [the

defendant]'s conviction for VICAR murder, predicated on second-degree intentional murder under N.Y. Penal Law § 125.25(1), categorically qualifies as a crime of violence under § 924(c)."). Given that the jury *necessarily* found Ocasio guilty of the intentional murders of Brown, Robert Antonetti, and Axel Antonetti, as reflected by his VICAR convictions for those murders in Counts Five, Seven, and Nine, Ocasio's Section 924(c) convictions remain valid—notwithstanding the inclusion of conspiracy to murder as additional predicate offenses.  *See Stone*, 37 F.4th at 831-32 (affirming a Section 924(c) conviction that was predicated on one crime that did not qualify as a crime of violence (conspiracy to commit murder in aid of racketeering in violation of New York Penal Law Sections 105.15 and 125.25(1)) and another crime that did qualify as a crime of violence (murder in aid of racketeering in violation of New York Penal Law Sections 125.25(1) and 20.00)), where "the jury found facts satisfying the essential elements of guilt on the valid predicate of substantive murder in aid of racketeering that would have sustained a lawful conviction on the firearm offense" (internal quotation marks and alterations omitted)); *Erbo*, 2020 WL 6802946, at *3 ("Thus, the jury necessarily predicated each of [the defendant]'s Section 924(c) convictions, at least in some part, on its finding that he was guilty of a substantive murder in each instance.  So long as murder qualifies as a crime of violence, there remains a valid predicate to sustain each of [the defendant]'s three Section 924(c) charges [even in the absence of the conspiracy predicates].").

Lastly, to the extent Ocasio additionally argues that his VICAR murders cannot constitute valid Section 924(c) predicates because his murder convictions may have rested on aiding-and-abetting theories of liability, *see* Motion at 11-12, that contention is without merit.  The Second Circuit has articulated that "aiding and abetting a crime of violence suffices for a § 924(c) conviction" because "the law imputes the acts of the principal to an aider and abettor."  *See Gomez*

*v. United States*, 87 F.4th 100, 110 (2d Cir. 2023) (analogizing liability under a *Pinkerton* theory to liability under an aiding-and-abetting theory and concluding that intentional second-degree murder under New York law constitutes a valid Section 924(c) predicate even where the conviction rested on *Pinkerton* liability); *Sessa v. United States*, No. 20-2691, 2022 WL 1179901, at \*2 (2d Cir. Apr. 21, 2022) ("A conviction under *Pinkerton* or an aiding-and-abetting theory simply does not transform a substantive crime of *murder* into a murder *conspiracy*.").  Accordingly, in the context of Section 924(c), it makes no difference whether the jury found Ocasio guilty of the intentional murders of Brown, Robert Antonetti, and Axel Antonetti as an aider and abettor or as a principal.  Under either theory of liability, each of Ocasio's Section 924(c) convictions rested on the valid predicate offense of intentional murder in the second degree.

## B.     Ocasio's *Brady* Claims

Ocasio additionally argues that his convictions were obtained in violation of *Brady* and *Giglio*, insisting that the Government withheld exculpatory and impeachment evidence concerning the Norris murder—namely, (1) the case file for the embezzlement investigation of Acevedo and (2) an NYPD DD-5 form cataloging an unidentified witness's account of the Norris murder scene. Suppl. Br. at 42-77.  Because these claims plainly do not rely on a new rule of constitutional law, they meet Section 2255(h)'s threshold requirements only if they rely on "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense," 28 U.S.C. § 2255(h)(1).  Ocasio's claims fall far short of that standard.

Ocasio argues that Acevedo's investigative file—insofar as it shows that Acevedo was not simply arrested for her alleged theft of PTA funds, but that she was indicted for embezzlement,

with the charge later adjourned in contemplation of dismissal in exchange for her paying restitution—invalidates the grounds the Government sought to preclude cross-examination on that prior arrest at Ocasio's federal trial.  Suppl. Br. at 41-44.  Ocasio further maintains that this newly uncovered information suggests that Acevedo "lied to the jury [at Ocasio's state trial] when questioned about accusations that she had stolen from the P.T.A." and that Ocasio's counsel at his federal trial would have been able to attack her credibility on this ground, had the Government provided the investigative file.  *Id.* at 48-51.

The DD-5 police report, according to Ocasio, mentions an unidentified woman who went to the police the day after the Norris murder to provide a statement on what she saw.  *Id.* at 59.  As relayed by Ocasio, the witness stated that "she watched Ocasio and a [B]lack man speak to each other for about ten minutes before the shooting . . . then she walked away from her window, heard shots, rushed downstairs, and while on the way downstairs, encountered Ocasio running up the stairs."  *Id.* at 63.  Relying on an affidavit from his state trial counsel, Ocasio claims that the building in which this witness encountered Ocasio was "likely at the corner of Seneca and Bryant Avenue."  *Id.*; *see also* Suppl. Opposition, Exh. F ("Richman Affirmation") ¶ 21 ("This unidentified woman's statement that Mr. Ocasio ran into a building, which was likely 860 Bryant Avenue and likely at the corner of Seneca and Bryant Avenues . . . .").  Ocasio then argues that the witness's statement undermines the testimony elicited at trial, reasoning that "[i]f Ocasio was running up the stairs in a building at the corner of Seneca and Bryant Avenue, he could not have also been simultaneously calmly walking towards Lafayette Avenue [as Acevedo had testified] nor running into an apartment on 1314 Seneca Avenue [as Rodriguez had testified]."  Suppl. Br. at 63.

Initially, these materials do not hold the significance Ocasio ascribes to them. That Acevedo was first indicted for embezzlement before the charges were ultimately dismissed has no material impact on the parties' respective positions at Ocasio's federal trial on the appropriateness of cross-examination. Whether arrested or indicted, Acevedo was never convicted of the charges arising out of her alleged theft of PTA funds—the operative ground rendering inappropriate any cross-examination on that topic, as determined by Judge Batts. *See* Tr. at 786:11-15. Nor does the fact of Acevedo's indictment contradict her testimony at Ocasio's state trial. *See* Dkt. 427 (exhibits appended to Ocasio's supplemental brief) at 1-34 ("State Trial Tr."). At the state trial, when asked whether she had stolen "a certain amount of money from the PTA at P.S. 48," Acevedo responded, "No, I didn't. I was accused of it, but I did not steal it." State Trial Tr. at 52:16-19. When asked whether she had "ever been convicted of any crime," Acevedo answered, "No, sir." *Id.* at 54:13-15. When asked whether she was "convicted of anything" in connection with the "incident concerning P.S. 48," she answered "No." *Id.* at 54:16-19. And finally, when asked whether "that case [was] dismissed," Acevedo answered, "Yes." *Id.* at 54:20-21. These statements are wholly consistent with the contents (as Ocasio describes them) of the investigative file.

As to the DD-5 police report, Ocasio's position on its relevance hinges on the likelihood that the unidentified witness, in recounting her encounter with Ocasio, was referring to the building at 860 Bryant Avenue. Yet, as Ocasio acknowledges, the DD-5 does not mention the address where the unidentified witness claimed to have observed Ocasio running up the stairs, and Ocasio offers no basis for the Court to make the inference that this encounter occurred at 860 Bryant Avenue. *Cf.* Richman Affirmation ¶ 20 ("Neither the woman's name nor her address is listed."); *id.* (explaining that the unidentified witness "states that Mr. Ocasio ran into one of two apartments at an unidentified address immediately after the homicide").

28

In sum, the contents of neither Acevedo's investigative file nor the DD-5 report undermines the jury's determination that Ocasio murdered Norris.

But even had Ocasio discovered evidence suggesting his innocence in the Norris murder, Ocasio still could not clear Section 2255(h)'s threshold because his culpability for the Norris murder was ultimately inconsequential to his federal convictions. As discussed, the Norris murder was not a standalone charge in the instant matter. Rather, Ocasio was charged with the murder of Norris solely in connection with the substantive RICO and RICO conspiracy charges (Counts One and Two) and specifically as one of nine predicate racketeering acts. As Judge Batts instructed, the jury needed to find Ocasio guilty of only *two* of those nine charged racketeering acts to find that the Government had met its burden of proving the "pattern of racketeering activity" element for the RICO offenses. Tr. at 3505:18-3506:23 (explaining pattern of racketeering activity for the substantive RICO charge), 3541:2-3542:9 (explaining pattern of racketeering activity in the context of RICO conspiracy). In returning the verdicts on Counts One and Two, the jury found Ocasio guilty of all nine racketeering acts. As a result, even a total implosion of the evidence underpinning the Norris murder would not destabilize Ocasio's RICO convictions, which would, in any event, have rested firmly on no fewer than eight other charged racketeering acts. *Cf. United States v. Dhinsa*, 243 F.3d 635, 670 (2d Cir. 2001) ("In the present case, excluding [the single invalidated predicate act], the jury's finding of four other legally sufficient predicate acts, which suffer no defects, are an ample basis for [the defendant's] convictions on the RICO counts." (internal quotation marks omitted)); *United States v. Paccione*, 949 F.2d 1183, 1198 (2d Cir. 1991) (affirming RICO convictions after invalidating one predicate act where the jury found eight additional predicate acts); *United States v. Coonan*, 938 F.2d 1553, 1565 (2d Cir. 1991) (affirming

RICO convictions after invalidating one predicate act where the jury found six additional predicate acts).

Ostensibly recognizing this, Ocasio urges that the Government's alleged withholding of the Acevedo case file and the DD-5 report have ramifications outside the Norris murder. Specifically, he argues that Acevedo's testimony bolstered the general credibility of the cooperating witnesses, on whose testimony the Government had principally relied, and that the purportedly false impression that Acevedo was a credible witness thus infected the entire trial. Suppl. Br. at 55-56. But this arguments rests on nothing more than mere speculation as to (1) the extent to which the evidence would have served to impeach Acevedo, (2) the impact of any such impeachment on the jury's view of the credibility of cooperating witnesses, like Serrano and Rodriguez, and (3) the resulting impact on the jury's determinations based on any diminished view of those witnesses' credibility. At bottom, Acevedo's investigative file and the DD-5 police report simply do not rise to "clear and convincing evidence that no reasonable factfinder would have found" Ocasio guilty of the offenses of conviction. The Court thus dismisses Ocasio's *Brady* claims.

For the same reasons, Ocasio's claims fail on their merits, in any event. Under *Brady* and its progeny, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Castillo v. United States*, No. 19 Cr. 428 (JGK), 2023 WL 6622071, at *7 (S.D.N.Y. Oct. 11, 2023) (quoting *Brady*, 373 U.S. at 87). And under *Giglio*, this same rule applies to impeachment evidence. 405 U.S. at 154-55. Such exculpatory or impeachment "[e]vidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Castillo*, 2023

WL 6622071, at *7 (citing *United States v. Orena*, 145 F.3d 551, 557 (2d Cir. 1998)).  Once again, the Norris murder was relevant to Ocasio's case simply as one of the nine charged racketeering predicate acts, all of which the jury found Ocasio guilty of committing.  As a result, the suppression of any evidence that could have impeached Acevedo's testimony as to the Norris murder could not be deemed material to Ocasio's counts of conviction.

## V.  Conclusion

For the aforementioned reasons, Ocasio's motion pursuant to 28 U.S.C. § 2255 is denied. The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 391 and 394 in case number 95 Cr. 942 (JPC) and to close case number 20 Civ. 9733 (JPC).  A certificate of appealability shall not issue because Ocasio has not made a substantial showing of a denial of a federal right.  *See Hoffler v. Bezio*, 726 F.3d 144, 154 (2d Cir. 2013).  Moreover, the Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal taken from this order would not be taken in good faith, and so denies *in forma pauperis* status for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is also respectfully directed to mail a copy of this Opinion and Order to Ronald Ocasio at:

> Ronald Ocasio
> Reg. No. 94-A-5445
> Green Haven Correctional Facility
> 594 Route 216
> P.O. Box 4000
> Stormville, NY 12582

SO ORDERED.

Dated: June 10, 2024
New York, New York

JOHN P. CRONAN
United States District Judge